Good morning, your honor. I'm Gregory Grantham, presenting the oral argument on behalf of appellants. This case involves the interpretation and application of the bankruptcy subrogation statute 11 U.S.C. 509 to a case involving two co-signers of a promissory note. The note was issued to a lender in exchange for a loan of $675,000. The co-signer which received all the loan proceeds was named Flamingo 55, Inc. It used those loan proceeds to purchase land in Las Vegas. It was issued to the plaintiff's name, took title to the land and gave the lender a first priority purchase money trust deed. The other co-signer was an entity named Broadway Acacia. It did not receive any of the cash proceeds of the loan. It incurred liability as an accommodation party and gave the lender a second trust deed on an office building in Laguna Beach, California. Long story short, the loan wasn't paid back at maturity. The lender commences foreclosures and Flamingo 55 goes into bankruptcy. Datacom, the lender, goes into the bankruptcy court seeking relief from stay and the bankruptcy court denies relief from stay to complete a foreclosure on the Las Vegas land, but grants the lender relief from stay to complete the foreclosure on the office building in California owned by Broadway Acacia because Broadway Acacia wasn't in bankruptcy. By that time, Broadway Acacia had been dissolved and the appellants in this case, John Saba and myself, were awarded title to that property. Were you investors in VA? Yes, Your Honor. And over the course of the next year, we made $94,000 in payments to the lender for interest, postponement fees, but we missed a postponement payment in March of 2005 and the lender foreclosed. When the lender foreclosed, it got paid in full. It received $888,000 from the foreclosure sale, which was the full amount of the principal of the note, $675,000, interest at 13% since maturity, attorneys fees, the full book. Well, let's take the issues one by one. With respect to A, the liable with, do you agree with the district court on reconsideration that there is joint liability or not? Oh, well, yes. I mean, when a note is signed by two parties, Broadway Acacia and Flamingo 55, both those parties are liable with one another. So obviously under 509A, it says an entity that is liable with the debtor on or that has secured a claim of a creditor against the debtor and pays that claim to subrogate it. The appellants certainly met that because they stepped in the shoes of Broadway Acacia and Broadway Acacia is jointly liable with Flamingo 55. That's all that 509A requires is being liable with. Now, where does the Hamada case fit in? Well, I think Hamada got it right. In fact, I think it's precedent that this court should follow. Hamada, of course, was a subrogation claim filed in a bankruptcy court. And this circuit looked at the subrogation claim in that case and analyzed it under the bankruptcy subrogation statute and went through the elements of 509A, B, and came to a determination. And next, it looked at the claim under equitable subrogation, which is a state law doctrine. So in essence, and although it didn't specifically state that, well, it did in essence state that they were distinct. And that's all we're asking this court to do is to analyze the claim separately. Because what the bankruptcy court did is it came up with a hybrid. It fused the two to create a false hurdle in 509A. Well, the bankruptcy court drew a distinction between being primarily liable and being secondarily liable, which is also a distinction that we drew in Hamada. Oh, the primary and secondary distinction was when you analyzed the equitable subrogation claim. So you looked at that distinctly and separately with the state law doctrine. Because the state law doctrine is different from 509A. When you go to Cato, the Supreme Court case — Our discussion in Hamada of primary and secondary is in the section dealing with Section 509. I'm looking at page 650 of the — of our decision in Hamada. Well, Your Honor, with all due respect, that's somewhat superfluous language. In that case, what the court found — if you want to look at it, it was a letter of credit case. And what the court found is that the subrogation claimant in that case was not liable with the debtor on the judgment because the bank that had issued the letter of credit had a separate and independent obligation. So it wasn't liable with. That's the holding of Hamada. It was a letter of credit case. If you look at the dissenting opinion and you analyze Hamada, you would realize that if the subrogation claimant had been liable with the — on the judgment, instead of separately liable and independently liable, that it would have had a valid claim. In this case, what's happening is that by fusing those two together, you are eliminating a whole class of people eligible under the bankruptcy subrogation statute. Well, look, you started your argument, I think almost the third word, by saying we are accommodation makers. That makes sense. Your argument makes a lot of sense to that. The bankruptcy court found the contrary. Bankruptcy court found you were not accommodation makers. You were a borrower, just like Flamingo, et cetera. You were actually a primary — they said a primary borrower. You were a borrower. And your telling us is that if two of us go out and borrow money for our use, and you wind up paying off the debt, you get subrogation, and the bankruptcy court said no. And when you started your argument, they said, well, we're just an accommodation maker. Yes. And let's say you're not an accommodation maker. Take the bankruptcy courts. Let's take, just for the moment, just pretend the bankruptcy court's correct. You're not an accommodation maker, or Broadway Acacia wasn't an accommodation maker. It was a joint venture partner in the development of this land. Then what? Well, you'd have a right of contribution. If you're a partner, and you are indeed a partner, and you're found to be a partner, and there's evidence to support that you're a partner, and there's a partnership agreement, then you would look at this, Your Honor. You would say, what is your percentage of ownership in that partnership? And if you paid more than your percentage of ownership, so if you were a 50 percent partner, and you paid 100 percent of the debt, then you'd have a right of contribution for the share of the other partner's obligations. Contribution ain't subrogation, exactly. Contribution is not. But here, the court found, in footnote 2. What I'm asking is the question, if you were a partner, and were entitled to contribution, then you'd have a claim, no doubt. You're saying, I think you're saying, but we're an accommodation maker, so we're entitled to subrogation. Absolutely. I understand what you're saying about accommodation makers. But you seem to be shifting the argument a little bit now. If you really were the primary Well, there's no evidence. What they call a primary. I understand you say there's no evidence. That's not my point. My question is, assuming the bankruptcy court turns out to be correct, assuming, then it sounds to me like subrogation is not what we're talking about. I agree with you, Your Honor. If you have a valid partnership, you don't have a subrogation claim. You have a contribution claim for the percentage share of the other partners that you paid. That's the way it goes in a bankruptcy case. But again, the bankruptcy court here, I mean, you would expect to have a partnership agreement and an agreement as to how to divide profits and losses so you would know what the contribution claim is. What share did we pay of Flamingo 55? You mean a written agreement? Yes, sir. Yes, Your Honor. You might expect it, but we all know you don't have to have a written agreement, right? We don't. I would agree with that. But if you have the testimony and the declarations of all the principals involved who say that essentially that Broadway Acacia was an accommodation maker. Well, some of those declarations came in after the bankruptcy court had ruled, I recall, and declined to use them. Well, no one ever raised, the trustee in this case never raised the issue in its claim objection that we were partners. It never said you should have filed a contribution claim. It was the bankruptcy court that came up with this as a way to basically sustain the objections. It was never raised by any of the parties. And if it had been raised, then those declarations, of course, would have been submitted. So if you're saying that we're too late in submitting our declarations, isn't it too late for the bankruptcy court to reach out and find a partnership when it was never raised by any of the trustee or the people filing the claim objections? So I think that they're hoist by their own petard to the extent that they're saying that we're late with our evidence. But plainly, we have a state court judgment that dissolved Broadway Acacia. The state court then had to inventory the assets of Broadway Acacia and distribute those assets. And it specifically found that Broadway Acacia didn't have an interest in Flamingo 55. And in that case, all the members of Broadway Acacia were before the court. None of them were in the bankruptcy case. And the state court judgment specifically states that Broadway Acacia had no interest in Flamingo 55. So how does the bankruptcy court then make a contrary finding? No, it's bound under the Full Faith and Credit Act to follow the state court judgment. And specifically in a claim objection proceeding, you can't find a partnership. That's more of an adversary proceeding where you have to bring in all the necessary parties. So with all due respect, I don't think, even though I think it's a valid argument, it's not supported by the facts. I'm out of time. You're out of time. Thank you, counsel. Thank you, Your Honor. We'll hear from the other side. May it please the Court. Dwayne Gilman appearing for Timothy Corey, the trustee in the Chapter 7 case, who's also present in the courtroom. There are really three defects in this would-be subrogation claim. First, the primary borrower, B.A., as it's been referred to in the briefs, is a primary obligor under the note. The finding is well supported by the entire record. The after-the-fact affidavits of the convicted felons, former clients of these parties, don't contradict the terms of the loan agreement. And as such, they fail to establish that they paid a claim against the debtor as required by 509A. As the second major point is they never paid, allowing foreclosure a Judge Jones, who I have the greatest respect for, a fabulous bankruptcy judge who I appeared in front of many times, and then a fabulous district judge, just simply got it wrong when he said foreclosure, overruling Sandoval's position on the main ruling and overruling that foreclosure constitutes payment. It doesn't. Why doesn't it? Assuming for the moment, assuming for the moment that they are correct, that all they are is a guarantor called an accommodation maker, all they are is a guarantor, and to secure their guarantee, they put up property that they own that's worth a million dollars. Okay? The debtor defaults, and there's a foreclosure to take their million dollar property away from them, which by the way is free and clear except for this lien. Okay? True. Your position would be that, well, if they had sold their property and given a million dollars, that would be one thing. But if they foreclose on their property and take a million bucks out of their estate, well, that's not payment. So they can't subrogate because they haven't paid the debt. That is our position. That's a pretty crabbed view of the word. Pay, is it not? Well, Your Honor, I'm happy to approach this case from an equitable point of view. Let's be equitable. That's a pretty. And I'm all to. That's a pretty strange thing to say if I owe you, say, $100,000, and I say, well, here, take my $100,000 Maserati. I haven't paid you because I didn't give you cash, but you've got my car. Or you grab my $100,000 Maserati and sell it off for $100,000. That's a pretty strange view of pay, is it not? Well, the key fact here, the key fact, and I'll move on to essentially the second point. How about that? Which is that they got consideration. BA had a liability on its balance sheet. It owed Datacom for the note it signed as a primary borrower. The check was made out to both Datacom and Flamingo. It was put in the senior care account and divided. Some of the proceeds went to purchase the property. Some of the proceeds were spent on Broadway Acacia's building. That's what's in the record. They didn't get it all. They got some of it. But that elimination of that debt is consideration. And hence, under the exception 509B2, they don't have a subrogation claim. So the long and the short of it is, if they are not simply, if they are truly a primary or they are a borrower, then... They don't get a subrogation claim. If they are simply a guarantor or accommodation maker... They might be. I mean, the father... If they are not, then maybe they do. But the finding of Judge Markell is well supported in the record and should not be reversed by this Court. This is the finding with respect to consideration? The finding of consideration and the finding with respect that Broadway Acacia was a primary borrower. He said, here is the promissory note. You signed it. Here is the collateral agreement. I don't remember the exact term of it. But everybody says, as the second party, that Datacom can look to either of the properties and you're a borrower. And that's what all the documentation said. Only the after-the-fact affidavits of Kershank, the Falins, the two Falins, contradict that. And the Court said, I don't believe that. I'm the finder of fact. I believe the documents describe the relationship. And that governs. And that finding was not reversed by either of the district judges, which reviewed this in full. Odd situation where we have two judges fully reviewing it, but the motion for reconsideration in front of Judge Jones, he didn't bother to address the reconsideration. He just went ahead and ruled. And he said, I don't believe that.   And he said, I don't believe that. But not with the other things. Roberts. First of all, though, the bankruptcy court, I think, said it wasn't going to consider those because they came in after it had ruled and it wasn't going to accept new affidavits on reconsideration. Isn't that right? Correct. And secondarily said, if I did, it wouldn't change my mind. It wouldn't change my mind. And those are the findings you made. Your Honor, I promised Mr. Stern that I would leave four minutes for him. I do want to emphasize that equitable considerations ought to be integrated into the analysis under 509. And I want to quote from a 1966 Supreme Court opinion, which I did not cite, because I didn't think of it until yesterday. It is just as the ---- If you're going to cite to us a case not raised in either of the briefs, then please supplement it. And I did not. Well, see the deputy clerk before you leave the building today and serve a copy on the opposing counsel and three copies on the court. I will, Your Honor. The decision is the Bank of Marin v. England. Justice Douglas, speaking for the Supreme Court, says, We do not read these statutory words with the ease of a computer. There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction. That echoes one member of this Court's decision on subrogation, which I'm not going to cite to. But equity matters. The attempt to divorce equity from this case by the would-be subrogating creditors is wrong jurisprudence. I take it you've decided to leave in two and a half minutes instead. I ---- Sorry. Good morning, Your Honors. May it please the Court. Mark Stern for Emerald Gate Construction, who is the real party and interest in this case. And I'd like to just very briefly, in the time left, talk about the quote from Judge Jones's decision, which says, There is no documentary evidence in the record to indicate that Broadway Acacia was secondary liable, nor was there any indication that Datacom had any knowledge of any surety agreements, the fact that the California law seemed significant. And why that's important is this case is about bad behavior. It's about ---- it started as an involuntary case where this property had been transferred not once but twice, once to the appellants, which had to be reversed. And all throughout the history of this case, the other parties did not treat the this as a subrogation or a surety case. They treated it in a different manner with regard to third parties. Datacom did not believe that this was a surety case. That was the lender. And this is important because in dealing with third parties and dealing with the equitable principles, the Court looks to what the evidence really is. And the evidence, the best evidence that was presented to this Court and to the three trial courts underneath were the documents that reflected exactly the state of facts, which were these were co-makers. These people were jointly liable. There was overwhelming evidence to that effect. And the fact that after the fact, self-serving affidavits were then offered. Roberts. If you could give us a sample of the translation, I'm not sure if that's the way to go, but it's in a particular context. And it's a trial court, so it takes under the course of the case, as we saw, a significant  And we have statutory subrogation here because we have a specific provision that can abrogate whatever common law principles of subrogation we might have otherwise adopted. That statute has been interpreted by the various cases and by equitable subrogation as requiring a co-maker not to be subrogated but to look to contribution. This Court in Hahn v. The United States, which is cited by Judge Markell, cites Takedo for that exact proposition. Thank you. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Fernandez, Bybee